**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Keith Turner,<br><br>    Plaintiff,<br><br>v.<br><br>JCB Corporation, et al.,<br><br>    Defendants. | No. CV-17-00572-PHX-ROS<br><br>**ORDER** |

Plaintiff Keith Turner worked as a truck driver for Defendant JCB Corporation. Turner was either an employee, independent contractor, or maybe both. During their relationship, Turner and JCB entered into several contracts, including one regarding Turner's compensation and another involving Turner's lease of a truck from JCB. In May 2016, the parties' relationship deteriorated. Eventually, Turner filed the present suit, alleging claims for discrimination based on race. JCB then filed counterclaims for breach of contract and breach of the covenant of good faith and fair dealing. Turner now seeks summary judgment on the counterclaims while JCB seeks summary judgment on some of the race discrimination claims.

**BACKGROUND**

Unless otherwise noted, the following facts are undisputed. Turner is an African-American truck driver who, as of March 2016, was operating his own company named D&K Carriers, LLC. At that time, JCB was a relatively small trucking company that paid drivers to deliver freight. In March and April 2016, Turner and JCB entered into four

separate agreements. In general, those agreements involved Turner performing services for JCB and Turner leasing a vehicle from JCB.

Two of the agreements were executed on March 11, 2016. The first was an "Independent Contractor Agreement." (Doc. 67-5 at 2). Under that agreement, Turner agreed to perform "Trucking and Maintanance [sic]" services for JCB. That meant Turner would perform "driver services as needed by [JCB]." The agreement stated the parties "understood" that Turner would not be considered "an employee with respect to JCB Trucking, but [would be] an independent contractor." (Doc. 67-5 at 2). The second agreement was an "Owner/Operator Truck Lease Agreement." (Doc. 60-4 at 6). Under that agreement, Turner agreed to use his own truck to deliver freight for JCB. The parties apparently understood that agreement's compensation provision but it is not comprehensible to an outsider. The provision merely stated JCB would pay Turner "80% OF GROSS on all shipments transported by [Turner], LESS ALL EXPENSES THAT are the responsibility of [Turner]." (Doc. 60-4 at 7). The agreement does not define "gross" or "expenses."

A little over a month after entering into the first two agreements, Turner and JCB entered into two more. On April 20, 2016, JCB and Turner entered into an "Agreement for Services." (Doc. 60-4 at 10). Pursuant to that agreement, Turner—through his company D&K Carriers—agreed to recruit other truck drivers to deliver freight for JCB. D&K Carriers would also "dispatch, route, manage and handle all logistics" for the drivers its recruited. (Doc. 60-4 at 10). D&K Carriers would receive "30% of the gross profits JCB makes off of each load" delivered by the drivers D&K Carriers recruited. (Doc. 60-4 at 11). This agreement stated D&K Carriers would be "an independent contractor" and would "not be considered an employee or joint venture with JCB for any purpose whatsoever." (Doc. 60-4 at 10).

Finally, on April 21, 2016, Turner and JCB entered into their fourth and final agreement. That agreement was titled "Vehicle Lease Agreement." (Doc. 60-5). Pursuant to that agreement, Turner agreed to lease a truck from JCB for 42 months at a rate of $640

every two weeks. At the end of the 42 months, the lease gave Turner the option to purchase the truck for $5,000. (Doc. 60-5 at 5). The lease required Turner "maintain the vehicle in good condition, repair maintenance and running order." (Doc. 60-5 at 5). JCB could terminate the lease if Turner failed to "pay any amount due" or failed "to comply with any of the covenants contained" in the lease. (Doc. 60-5 at 5).

The parties have not provided a clear explanation of their relationship from its beginning in March and the subsequent months. It appears Turner performed under the agreements by delivering freight and recruiting others to drive for JCB. It is not clear, however, what Turner's day-to-day work was like or the extent to which JCB exercised control over that work. All that can be gleaned from the present record is that the relationship was amicable for a very short time. Disputes arose in May 2016 regarding the parties' obligations to each other.

According to JCB, Turner failed to make the payments due on May 6, 2016, under the Owner/Operator Truck Lease Agreement. JCB explains that while the Owner/Operator Truck Lease Agreement provided Turner would be paid for providing services, it also entitled JCB to deduct expenses from Turner's compensation. According to JCB, this structure resulted in the expenses being more than Turner was owed in compensation. Thus, JCB claims some of Turner's "net settlements were negative." (Doc. 67 at 7). JCB claims Turner stopped making payments on the Vehicle Lease Agreement around the same time he began owing money under the "net settlements."

Turner continued to work for JCB throughout May 2016, despite allegedly not keeping up on his financial obligations. According to Turner, on May 26, 2016, an employee of JCB, Cody Eaton, called Turner. The parties disagree on whether this call occurred, meaning the description of the call comes entirely from Turner. According to Turner, Eaton called and invited Turner to go to Eaton's house and do cocaine. (Doc. 60-1 at 5). Turner declined. Eaton then allegedly stated:

> We should have kept our foot on your niggers' necks. . . . We used to beat the S-H-I-T out of you guys, out of you niggers, and we should have never let our -- we should have never took our foot off you niggers' neck. . . .

- 3 -

> [Y]ou know, we used to kick you niggers asses and I'm with the KKK. You haven't seen me and [a JCB vice president] in our mask[s]. . . . I'm in the KKK. You haven't seen me -- You haven't seen me in my mask . . . You're a good nigger. . . . I used to have niggers work for me before . . . some niggers [did me] bad before. But, [Turner], you're a good nigger.

(Doc. 60-1 at 6). The parties do not explain what happened after this call. Turner claims he reported Eaton's behavior to Mark Ganley, JCB's owner. (Doc. 60-1 at 7). Ganley allegedly apologized for Eaton's behavior and said it was "unacceptable." The parties do not identify any formal actions taken by Ganley. A few months later, Eaton allegedly called Turner again. During that call, Eaton allegedly said "[D]on't go get a lawyer . . . you know that other day that we talked, disregard that. Don't go get a lawyer." (Doc. 60-1 at 8).

Turner apparently continued to work for JCB until the end of July 2016. During that time, JCB believes the amount Turner owed continued to grow. At the end of July, JCB repossessed the truck Turner had been leasing. According to JCB, Turner had not maintained the truck in good condition and JCB had to incur substantial sums in repossessing and repairing the truck. As of August 2016, Turner and JCB were no longer working together.

In February 2017, Turner filed the present suit. Turner alleged claims for "hostile work environment" and "retaliation" under 42 U.S.C. § 1981 and Title VII. (Doc. 3 at 1). JCB answered the complaint and asserted counterclaims for breach of contract and breach of the implied covenant of good faith and fair dealing. The counterclaims were based on Turner's alleged failure to perform under the Owner/Operator Truck Lease Agreement and the Vehicle Lease Agreement. (Doc. 8). The parties proceeded with discovery.

In June 2018, the parties filed cross-motions for summary judgment. Turner seeks summary judgment on all of the counterclaims while JCB seeks summary judgment only on the Title VII claims. The fact that JCB seeks summary judgment only on the Title VII claims means the parties agree this case must, at least, proceed to trial on Turner's claims under 42 U.S.C. § 1981. And given that claims brought under 42 U.S.C. § 1981 and Title

VII are so similar, it is unclear what purpose is served by JCB seeking dismissal of the Title VII claims. *See Nat'l Ass'n of African Am.-Owned Media v. Charter Commc'ns, Inc.*, No. 17-55723, 2019 WL 419393, at *5 (9th Cir. Feb. 4, 2019) (noting § 1981 and Title VII claims are very similar). In any event, a review of the parties' summary judgment motions establishes trial should proceed on all the claims and counterclaims.

**I.  Contract Claims Must Proceed**

Turner seeks summary judgment on the counterclaims for breach of contract and for breach of the covenant of good faith and fair dealing. Turner first argues JCB has no evidence establishing a breach occurred. Turner then argues JCB cannot establish it suffered any "quantifiable damages" as a result of Turner's behavior. (Doc. 59 at 3). And finally, Turner argues the breach of covenant of good faith and fair dealing counterclaims should be dismissed as duplicative of the breach of contract counterclaims. Turner has not provided a sufficiently coherent description of the background facts to allow for resolution of any of these arguments in his favor.

Turner's first argument is that JCB has no evidence Turner breached the Owner/Operator Truck Lease Agreement or the Vehicle Lease Agreement. But according to documents submitted by JCB, Turner repeatedly failed to pay amounts due under the two agreements. (Doc. 67-9). That is, Turner did not pay the expenses he was required to pay under the Owner/Operator Truck Lease Agreement nor did he pay the bi-weekly lease amounts due under the Vehicle Lease Agreement. If Turner failed to pay amounts due under the agreements, he breached the agreements. Turner's argument that JCB has no evidence of breach is incorrect.

Turner's second argument is that, even if the Court were to conclude he breached the contracts, JCB cannot point to non-speculative damages it suffered as a result. According to Turner, JCB never produced documents during discovery demonstrating "how JCB arrived at any estimate of its damages." (Doc. 59 at 6). But JCB points to documents listing in detail the amounts allegedly owed by Turner as a result of his breaches. Based on those documents, JCB's damages are not too speculative. Turner is

not entitled to summary judgment based on his damages argument.[1]

Finally, Turner argues he is entitled to summary judgment on the counterclaims for breach of the covenant of good faith and fair dealing because they are duplicative of the breach of contract claims. That may or may not be accurate. "[T]he remedy for breach of the implied covenant of good faith is ordinarily on the contract itself." *Rawlings v. Apodaca*, 726 P.2d 565, 574 (Ariz. 1986). To the extent JCB is basing its breach of the covenant of good faith and fair dealing counterclaims on the same actions as its basic breach of contract counterclaims, proceeding on both would be inappropriate. But the Court cannot determine the precise basis for the claims, meaning it is not clear that the claims are inappropriately duplicative. At present, all that can be determined is that Turner has not established he is entitled to judgment as a matter of law on the breach of the covenant of good faith and fair dealing counterclaims.

## II. Title VII Claims

JCB seek summary judgment on Turner's claims for race discrimination and hostile work environment under Title VII. JCB presents two arguments why Turner is not entitled to invoke Title VII. First, JCB points out Title VII does not apply to independent contractors and, according to JCB, Turner was an independent contractor, not an employee. Second, JCB observes Title VII only applies to employers with fifteen or more employees. JCB claims it did not have fifteen or more employees at the relevant time. JCB has not submitted a sufficient factual basis to grant summary judgment under either argument

### A. Independent Contractor or Employee

"Title VII protects employees, but does not protect independent contractors." *Adcock v. Chrysler Corp.*, 166 F.3d 1290, 1292 (9th Cir. 1999). Thus, JCB is correct that Turner's Title VII claim must fail if he was an independent contractor. However,

---

[1] It is possible JCB did not comply with its disclosure obligations regarding damages. *See* Fed. R. Civ. P. 26(a)(1)(A)(iii) (requiring disclosure of damages computations). If that is the case, JCB may not have sufficient evidence to prevail at trial. *See* Fed. R. Civ. P. 37(c) (noting failure to make required disclosure will result in exclusion of evidence). But Turner did not make a non-disclosure argument in his summary judgment papers. Any non-disclosure argument will be addressed in the event Turner files an appropriate motion before trial.

determining whether Turner was an employee or an independent contractor "requires a fact-specific inquiry" into "the economic realities of the situation." *Id.* JCB has not provided enough undisputed facts to accurately assess "the economic realities" of Turner's relationship with JCB. *Id.*

The Ninth Circuit has listed eleven factors a court should evaluate when determining if an individual was an employee covered by Title VII. Those factors are:

> [1] the skill required; [2] the source of the instrumentalities and tools; [3] the location of the work; [4] the duration of the relationship between the parties; [5] whether the hiring party has the right to assign additional projects to the hired party; [6] the extent of the hired party's discretion over when and how long to work; [7] the method of payment; [8] the hired party's role in hiring and paying assistants; [9] whether the work is part of the regular business of the hiring party; [10] whether the hiring party is in business; [11] the provision of employee benefits; and [12] the tax treatment of the hired party.

*Murray v. Principal Fin. Grp., Inc.*, 613 F.3d 943, 945–46 (9th Cir. 2010). But even these factors are not exhaustive, as the Court's focus must be on the overall reality of the particular scenario at issue. JCB's briefing does not address or engage with the relevant factors in a meaningful way.

Based on the present briefing, there are genuine disputes of material fact regarding the following aspects of the relationship between Turner and JCB: who owned the equipment Turner used; where Turner performed his work; how long Turner worked for JCB; the extent to which JCB could assign work to Turner; the extent to which JCB could control the times Turner worked; whether Turner was ever compensated as an employee; and whether Turner could hire assistants. Overall, the Court lacks a sufficient record to determine the "economic realities of the situation."[2]

Instead of focusing on the relevant factors, JCB points out the parties' agreements stated Turner would be an independent contractor. But the existence of an agreement stating an individual is an independent contractor is only one factor the Court must

---

[2] Instead of the applicable test, JCB argues the Court should apply the test applicable under Arizona law for differentiating between employees and independent contractors. While the Arizona and Title VII tests are similar, JCB offers no explanation why the Court would look to Arizona law in these circumstances.

- 7 -

consider. *Barnhart v. New York Life Ins. Co.*, 141 F.3d 1310, 1313 (9th Cir. 1998) (deeming existence of "clear language" stating individual would be independent contractor was one of many factors to consider). In light of JCB's failure to provide a sufficiently developed picture of the parties' relationship, the parties' agreements are not enough on their own to conclude Turner was an independent contractor. JCB is not entitled to summary judgment based on Turner's alleged status as an independent contractor.

### B. Number of Employees

JCB's final argument against Turner proceeding on his Title VII claims is that JCB did not have enough employees for Title VII to apply. Title VII applies "to any employer who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year." *Walters v. Metro. Educ. Enterprises, Inc.*, 519 U.S. 202, 204 (1997). JCB argues it only had seven employees "during the spring and/or summer of 2016," when Turner was working with JCB. (Doc. 65 at 4). JCB's only support for this assertion is the deposition testimony of its owner, Mark Ganley. But during Turner's deposition, he was also asked about the number of employees during that time. Turner stated JCB had at least 15 employees while he was working there.

As the party seeking summary judgment on the number of employees, JCB should have offered much more evidence than a single remark during a deposition. Presumably JCB has payroll records or other forms of documentation which would indicate the actual number of employees it had in 2016. JCB did not proffer such records. For present purposes, the Court merely has competing deposition testimony. And because JCB is the party seeking summary judgment, the Court must accept Turner's deposition testimony as true. *See Koch v. Hankins*, 928 F.2d 1471, 1473 n.4 (9th Cir. 1991) (noting deposition testimony of non-moving party must be accepted as true at summary judgment). Turner's deposition testimony establishes there is a genuine dispute of fact whether JCB had the requisite fifteen employees.[3]

---

[3] At trial, Turner will need to establish JCB had fifteen or more employees for twenty calendar weeks. That is, if JCB only had more than fifteen employees for one week, Title

- 8 -

Accordingly,

**IT IS ORDERED** the Motion for Summary Judgment (Doc. 58) and Motion for Summary Judgment (Doc. 59) are **DENIED**.

**IT IS FURTHER ORDERED** no later than **April 19, 2019**, the parties shall file all Motions in Limine. Responses are due ten days afterward. No replies are permitted unless ordered by the Court. Prior to filing any Motion in Limine, the parties must confer and discuss the contents of each planned motion. No Motion in Limine should be filed if the other party does not oppose the relief requested.

**IT IS FURTHER ORDERED** no later than **April 19, 2019**, the parties shall file the Joint Proposed Pretrial Order.

**IT IS FURTHER ORDERED** no later than **April 19, 2019**, the parties shall review the Court's standard Juror Questionnaire (available on the Court's website) and submit **NO MORE THAN FIVE PROPOSED QUESTIONS EACH** to be added to the standard Juror Questionnaire with the Court's approval no later than. Each proposed question shall stand alone and shall not contain sub-parts.

**IT IS FURTHER ORDERED** no later than **April 19, 2019**, the parties shall submit a Joint Statement of the Case, of no more than a few short sentences for the Juror Questionnaire.

**IT IS FURTHER ORDERED** no later than **April 19, 2019**, the parties shall submit a second Joint Statement of the Case, of no more than two short paragraphs to be read to the jury.

**IT IS FURTHER ORDERED** no later than **April 19, 2019**, the parties shall file and submit via email (silver_chambers@azd.uscourts.gov) in Word format proposed Jury Instructions in compliance with the procedures available on the Court's website, including but not limited to: 1) a *joint* set of proposed jury instructions where the parties' instructions agree; 2) a separate set of instructions (one for each party) where the parties do not agree; and 3) legal authority supporting all proposed instructions whether the parties agree or not.

---

VII will not apply.

Where the parties do not agree, the opposing party shall clearly state its objection to the proposed instruction and the proposing party shall clearly state its response.

**IT IS FURTHER ORDERED** no later than **April 19, 2019**, the parties shall jointly file a proposed form of verdict, or if the parties do not agree, they may separately file proposed forms of verdict.

**IT IS FURTHER ORDERED** no later than **April 19, 2019**, the parties shall deliver to chambers excerpts of the deposition testimony they propose to present at trial, in compliance with the procedures available on the Court's website (found in Deposition Designation Procedure for Judge Silver), including but not limited to: Plaintiffs highlighting in yellow the portions they wish to offer and Defendants highlighting in blue those portions they wish to offer. If either party objects to the proposed testimony, a specific and concise objection (e.g., "Relevance, Rule 402") shall be placed in the margin adjacent to the proposed testimony.

**IT IS FURTHER ORDERED** a final pretrial conference is set for **June 18, 2019**, **at 2:00 p.m.,** at which time the Court will review Juror Questionnaires. The parties shall meet and confer prior to this date regarding the Juror Questionnaires and email to the Courtroom Deputy no later than noon on **June 17, 2019**, a list of any jurors they agree should be stricken for cause, along with any objections to jurors they do not agree should be stricken for cause. **The parties shall not file this list.** The Court will rule on any disputed jurors at the final pretrial conference.

**The parties will be supplied a disk containing the questionnaires approximately one week prior to the final pretrial conference. Counsel shall bring a copy of the questionnaires to the conference for review. Counsel are required to return the disk to the Courtroom Deputy and destroy all copies of the questionnaires no later than the last day of trial.**

**IT IS FURTHER ORDERED** trial to a jury is set for **June 25, 2019** at 8:30 a.m. Estimated length of trial is 4 days.

**IT IS FURTHER ORDERED** the parties shall comply with the Exhibit Procedures

found on the Court's website at www.azd.uscourts.gov / Judges' Information / Orders, Forms & Procedures for Hon. Roslyn O. Silver.

Dated this 21st day of February, 2019.

Honorable Roslyn O. Silver
Senior United States District Judge